**C.W. OVER & SONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–741C.**

United States Court of Federal Claims.

May 20, 1999.

---

Francis R. Laws, Baltimore, MD, for plaintiff.

Raymond M. Saunders and Phyllis Jo Baunach, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant.

## OPINION

MILLER, Judge.

This contract case is before the court after argument on defendant's motion for summary judgment. The issues to be decided are (1) whether the contract price as awarded included all state sales tax on materials; (2) whether the contractor's performance of work orders under $2,000.00 was beyond the scope of the contract; and (3) whether the Government applied improper coefficients for modifications to certain delivery orders.

## FACTS

On January 14, 1994, the Maryland Procurement Office of the National Security Agency (the "NSA") awarded contract MDA904–94–D–2502 to C.W. Over & Sons, Inc. ("plaintiff"). This firm fixed-priced contract was an indefinite delivery, indefinite quantity job order contract providing for construction and renovation work at Fort George G. Meade, Maryland ("Fort Meade"). The duration of the contract was a base year with four options years; the NSA exercised three of the four option years.

1. *Sales tax*

The contract incorporated by reference a *Job Order Contract Unit Price Book*, Vol. II (Aug. 19, 1991) (the "UPB"), which is a project-segment based compilation of pre-priced work items and provides the costs for individual construction tasks. Per the contract, the contractor was to provide three fixed coefficients for the base year and each of the option years. Clause B.2 of the contract defines coefficient as "a numerical factor that represents the contractor's direct and indirect costs and profit over and above the fixed prices established in the [UPB]." The three fixed coefficients for each year represented the cost of normal working hours, other than normal working hours (overtime), and flya-

way services or services not performed at Fort Meade. Although the coefficients would change for each successive year of the contract to account for differing economic conditions, the coefficients would remain fixed during the year for which each was designated. Plaintiff's proposal included the coefficients applicable during the base year and each of the option years, which were incorporated into the contract upon award.

Clause B.2 provided: "The unit prices include all labor, material and equipment necessary to install one unit of a particular line item. The coefficients will be used to price the cost of each Delivery Order by multiplying the applicable coefficient by the unit prices and quantities. The coefficients must include all associated costs that are not included in the [UPB]." Because the contract indicated that "no allowances for any prices other than the non-prepriced item unit prices" would be permitted, whether the UPB prices include a coefficient that includes sales tax is significant.[1]

The parties dispute what costs are encompassed within the UPB price listing, specifically with regard to state sales tax. Defendant asserts that the UPB prices included applicable sales tax, so that the absence of sales tax from the coefficient was proper. In contrast, plaintiff contends: "Sales Tax is a cost not included in the [UPB]." Plf's Proposed Finding No. 6, filed Feb. 26, 1999. According to plaintiff, because sales tax is not a cost contained within the UPB, it should have been included in the coefficient. Contending that it relied upon statements of tax exemption in excluding state sales tax from its coefficient, plaintiff argues, *inter alia,* its entitlement to an equitable adjustment for state sales tax.

Under this contract the NSA notified plaintiff of the work it required through delivery orders. Upon receiving a delivery order, plaintiff prepared a proposal consistent with clause H.21 of the contract. NSA technical personnel would verify the estimates in the proposal. Once approved, the coefficient would be applied as provided in clause H.21.g, which states:

The base prices determined will be multiplied by the number of work units required to determine the extended base unit price, which will be converted to the delivery order firm-fixed price by multiplying the extended base unit price by the appropriate current contractor's coefficient.

The contracting officer issued an omnibus delivery order for each year that was intended to provide sufficient funding to pay for all small jobs anticipated during that year. Delivery Orders ("DO") 0001, 0043, 0135, and 0210 had respective values of $420,000.00, $400,000.00, $450,000.00, and $275,000.00.

### 2. *Small job orders*

Clause 1.4, entitled DELIVERY–ORDER LIMITATIONS, placed a minimum value on orders, stating, in pertinent part:

When the Government requires supplies or services covered by this contract in an amount of less than $2,000.00, the Government is not óbligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

The record contains a series of correspondence and discussions concerning the provision for small job orders requiring Quick Response Capability. In a request for clarification from plaintiff, the NSA predicted that 300 small requirements would be needed per month. The parties dispute whether plaintiff agreed to perform small job orders valued under $2,000.00, and whether the NSA agreed to bundle job orders together until the $2,000.00 minimum was reached. In this regard Contracting Officer Mark C. Doring authored a memorandum dated April 15, 1994 to David L. Cobb, the Contracting Officer's Representative. The memorandum stated:

For requirements between $0.00 and $2,500.00, the contractor shall use R.S. Means to estimate jobs and submit the estimates to the Government for review and approval. R.S. Means shall be used until [the U.S. Army Corps of Engineers

---

1. The UPB prices applied to all delivery orders except for those work requirements that were not included within the UPB. For such non-pre-

priced delivery orders, the parties would price the requirement through negotiation after the submission of multiple estimates.

Computer Aided Cost Accounting System] is made available to the contractor. Upon approval, L584 will issue work orders for the contractor's estimate, and L584 will verify that the work has been completed. L584 will bundle work orders until they meet the $2,000.00 threshold for individual delivery orders, and when possible, bundle them for work in the same areas (building complexes).[2]

Plaintiff contends that the NSA's failure to bundle work orders and continued issuance of work orders valued under $2,000.00 resulted in a loss of $264,992.00. This loss stemmed from the application of plaintiff's coefficient to work that plaintiff was not required to perform under the contract. Plaintiff maintains that the cost of site inspection, estimating the work, and performance increased markedly for jobs under the $2,000.00 threshold and that such costs could not be covered by the proposed coefficient. Thus, plaintiff seeks an equitable adjustment totaling $264,992.00 for the issuance of work orders under $2,000.00 in violation of the contract.

### 3. Expired coefficients

Finally, plaintiff challenges the NSA's application of expired coefficients for work orders performed during the option years. Plaintiff seeks an equitable adjustment in the amount of $6,202.74 under the Changes clause for application of the wrong coefficient on delivery orders 0168, 0198, 0192, 0204, 0193, 0207, 0232, and 0135.

On February 20, 1998, plaintiff submitted a certified claim to the contracting officer for $1,069,189.71 representing additional costs incurred during the course of performance. On July 20, 1998, the contracting officer denied plaintiff's claim. Plaintiff seeks review of this determination pursuant to the Contract Disputes Act, 41 U.S.C.A. § 609(a)(1) (West Supp.1998) (the "CDA").

### DISCUSSION

### 1. Summary judgment standards

Summary judgment is appropriate when there are no genuine issues of material fact

in dispute and the moving party is entitled to judgment as a matter of law. See RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. See id. The moving party has the burden of establishing that there are no genuine material issues in dispute and entitlement to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this burden has been satisfied, the non-movant must provide sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. See id. at 322–25, 106 S.Ct. 2548. The evidence presented, however, must be more than merely colorable. See id.; Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed.Cir.1984) ("Mere denials or conclusory statements are insufficient."); see also Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed.Cir.1988) ("If the evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted."). Although evidence may be presented in the form of affidavits by knowledgeable persons, see Celotex, 477 U.S. at 324, 106 S.Ct. 2548; Barmag Barmer, 731 F.2d at 836, mere assertions, conclusory allegations, or arguments by counsel are insufficient to demonstrate that an issue requires trial. See Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc., 45 F.3d 1550, 1561–62 (Fed.Cir.1995); Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1404 (Fed. Cir.1984) ("Argument and assertion of counsel cannot substitute for factual statements under oath that establish a genuine material issue of fact."); see also RCFC 56(f); SRI

---

**2.** L584 is the technical organization at Fort Meade responsible for facilities engineering. R.S. Means is a construction industry manual which contains standardized estimates for various construction projects.

*Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985) (noting that non-movant must demonstrate an evidentiary conflict by more than conclusory statements or mere denials).

On a motion for summary judgment, the court is not permitted to weigh the evidence or seek to determine the truth of the matter. *See Anderson*, 477 U.S. at 249, 255, 106 S.Ct. 2505. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

When responding to a motion for summary judgment, the non-moving party may seek discovery to enable it to present the court with evidence of the facts underlying its opposition. "[W]hen the discovery is reasonably directed to 'facts essential to justify the party's opposition' ... such discovery must be permitted or summary judgment refused." *Opryland USA Inc. v. Great American Music Show, Inc.*, 970 F.2d 847, 852 (Fed.Cir. 1992) (quoting Fed.R.Civ.P. 56(f)[3] and citing *Anderson*, 477 U.S. at 250 n. 5, 106 S.Ct. 2505). "The Supreme Court has made clear that summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery." *Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed.Cir.1988) (finding award of summary judgment prior to requested discovery is premature). Nonetheless, "[s]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed.Cir.1984) (noting mere assertions are insufficient to raise genuine issue of fact); *see Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed.Cir.1996) ("A trial court's denial of a motion for further discovery under Rule 56(f) will not be deemed an abuse of discretion if 'there is no reason to believe that it will lead to the denial of a pending motion for summary judgment.'") (citation omitted); *Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 1389–90 (Fed.Cir.1989) (discussing Fed. R.Civ.P. 56(f) and finding no abuse of discretion in denial of vague, unfocused request for discovery).

To obtain discovery, the party must state, by affidavit, explicit reasons why discovery is required in opposition to the motion for summary judgment. *See Opryland USA*, 970 F.2d at 852 (discussing Fed.R.Civ.P. 56(f)). RCFC 56(g) provides, in pertinent part:

> Should it appear from the affidavits of a party opposing the motion that such party cannot for reasons stated present by affidavit facts essential to justify such party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The party seeking discovery " 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts.' The ... moving party ... is 'required to state with some precision the materials he hope[s] to obtain with further discovery, and exactly how he expect[s] those materials would help him in opposing summary judgment.' " *Simmons Oil*, 86 F.3d at 1144 ("It is not enough simply to assert ... that 'something will turn up.' ") (citations omitted); *see New Am. Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1081 (Fed.Cir. 1989) (" 'A party may not simply assert that discovery is necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit.' ") (citations omitted).

### 2. *Procedural history*

Plaintiff filed its complaint in this case seeking review of the contracting officer's decision on September 23, 1998. Defendant

---

**3.** Fed.R.Civ.P. 56(f) is the counterpart to RCFC 56(g).

responded to the complaint with a motion for summary judgment filed January 4, 1999. Plaintiff was granted an extension of time to acquire new counsel, who was substituted on February 9, 1999. On February 26, 1999, plaintiff filed its response to defendant's motion. Defendant's reply was filed on March 18, 1999. By order dated March 22, 1999, the court scheduled argument on defendant's motion for April 5, 1999. After defendant filed its motion to suspend discovery on March 26, 1999, an order suspending discovery issued March 29, 1999, pursuant to RCFC 77.1(b)(2).[4] On March 30, 1999, plaintiff requested postponement of oral argument, which was granted by order dated April 1, 1999. Argument was held on April 20, 1999. Subsequently, plaintiff filed its Motion To Reconsider the Court's Decision Suspending Discovery or, in the Alternative, for Continuance to Allow Plaintiff To Conduct Discovery on April 26, 1999.[5] Attached to this motion was an RCFC 56(g) affidavit from plaintiff's counsel indicating the need for discovery to ascertain whether sales tax was included within the UPB price listing. Although the parties engaged in some discussion regarding a voluntary investigation into the composition of the UPB prices following oral argument, defendant ultimately declined to conduct such an investigation in the absence of a directive from the court.[6]

### 3. *Reimbursement of sales tax*

■ The first issue concerns whether the contract price, as awarded, included all state sales tax on materials. To determine whether the contract price included Maryland sales tax, the court first must look to plain meaning of the contract. *See Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998); *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.

1993). When the contract language is unambiguous, the court's inquiry is at an end, and the plain language of the contract is controlling. *See Textron Defense,* 143 F.3d at 1469. A contract term is unambiguous when there is only one reasonable interpretation. *See Triax Pac., Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir.1997); *A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir. 1994); *see also Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) (noting that contract is ambiguous where two reasonable interpretations are consistent with contract language). The contract must be considered as a whole and interpreted to " 'effectuate its spirit and purpose,' " giving " 'reasonable meaning to all parts.' " *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)); *see Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985). Such construction " 'will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *Gould,* 935 F.2d at 1274 (quoting *Arizona,* 216 Ct.Cl. at 236, 575 F.2d at 863); *see Fortec Constructors,* 760 F.2d at 1292.

■ Plaintiff's claim to a reimbursement of state sales tax paid on materials and supplies purchased pursuant to the contract is predicated on plaintiff's excluding sales tax computations from its bid. According to the contentions put forth in its brief and during oral argument, plaintiff did not include sales tax as a coefficient factor in its bid based on the NSA's representation that it was tax exempt in clause G.3, the Proposal Preparation Instructions ("PPI"), and the Proposal Preparation Requirements (the "PPR").[7]

---

4. The court ruled on defendant's motion to suspend discovery without further briefing, because defendant's motion for summary judgment was fully briefed and ready for decision.

5. Plaintiff filed an amended motion on April 28, 1999.

6. Following oral argument, the court conducted two brief conference calls with the parties concerning the investigation into whether the UPB

price listing included state sales tax. Although indicating that the court was not requiring the parties to conduct the investigation in the absence of a motion from plaintiff, the court did suggest that this information definitively could resolve any disagreements pertaining to Count I of the complaint.

7. The PPR, Volume II, B.6, which was included in the Request For Proposals ("RFP"), informs the bidder what the coefficients "shall include at a minimum," including "Tax laws (local, Feder-

Plaintiff asserts that the contract provisions required a detailed listing of the factors that plaintiff was incorporating into its coefficient, which, upon submittal, the NSA would review to ensure that the contractor understood the requirement. In accordance with the contract provisions, plaintiff maintains that it specified the elements comprising its coefficients and "expressly advised [the NSA that] [t]he bid package indicates the use of Maryland State Tax Exemption Certificate number 300[0]500 and therefore the coefficient does not contain any allowance for sales tax." Plf's Br. filed Feb. 26, 1999, at 9. The NSA "did not once mention or question [plaintiff's] consideration of sales taxes in its calculation of the coefficient." *Id.* at 10. Plaintiff also posits that sales tax is not incorporated into the UPB price listing. In light of this fact, plaintiff argues that, but for the NSA's representation of tax exemption, it would have included a factor for sales tax in the coefficients. Contending that defendant provided no concrete evidence that sales tax was included in the UPB, plaintiff deems summary judgment inappropriate. Plaintiff also charges the NSA with breach of contract for refusing to allow plaintiff to use its tax exempt number following the award of the contract.

1) *Plain meaning*

Defendant counters that Federal Acquisition Regulation (FAR), 48 C.F.R. § 52.229–3 (1998), incorporated by reference into the contract, "makes absolutely clear that the contract price included 'all applicable Federal, State, and local taxes and duties.'" Def's Br. filed Mar. 18, 1999, at 1–2 (quoting FAR § 52.229–3). Defendant insists that Volume III of the UPB, which was not incorporated into this contract, provides no insight into the composition of the prices listed and is irrelevant to the disposition of this motion. Defendant also contends that the plain language of clause G.3 "makes clear that it contains no representations regarding tax exemption," *id.* at 4, and that it placed upon plaintiff the burden of ascertaining if a particular transaction was exempt from taxation. Defendant maintains that both clause G.3 and FAR § 52.229–3 contradict plaintiff's interpretation of tax exemption:

> [Plaintiff] in essence would convert this firm fixed-price contract into a cost reimbursable contract in contravention of the FAR. [Plaintiff's] novel interpretation also ignores case law which has consistently held that the inclusion of clause 52.229–3 in a firm fixed-price contract means that the contractor, not the Government, bears the risk of determining the applicability of all Federal state and local taxes.

*Id.* at 5. Defendant further argues that the NSA did not breach the contract by failing to provide plaintiff with its tax exemption certificate because, according to clause H.9, the use of the certificate falls within the discretion of the NSA.[8] Highlighting that plaintiff

al, State, etc.)." The PPI, Volume II, C, provides:

> The Government requires the contractor to provide a breakdown and explanation of all elements used to derive the contractor's coefficients such as those listed in the Unit Price Book, Section 01030—Special Project Procedures. The Government will analyze this information to determine if the contractor has a sufficient understanding of the requirements.

Although neither the PPR nor the PPI was incorporated into the contract, PPR, Volume II, C also requires essentially the same information, which will be reviewed to assess the contractor's understanding. In further support of its position, plaintiff points to the U.S. Army Job Order Contracting, Basic Course, Sample Standard Operating Procedure, which states, in pertinent part: "The contractor's coefficient includes: ... Tax Laws (i.e. Maryland State Tax) ...." Plaintiff did include a factor for corporate taxes within its

coefficient as evidenced by paragraph 12 of the complaint, which recites:

> [Plaintiff] prepared and submitted its bid proposal in accordance with the RFP. Pursuant to the Government's [PPI], [plaintiff's] coefficient included an amount for corporate taxes, but according to [plaintiff's] reasonable interpretation of the RFP, did not include an allowance for Maryland sales tax. Instead, [plaintiff's] bid proposal expressly notified the NSA that its coefficient did not include an allowance for Maryland sales tax. [Plaintiff's] bid proposal stated:
>> The bid package indicates the use of Maryland State Tax Exemption Certificate Number 3000500 and therefore the coefficient does not contain any allowance for sales tax. Corporate taxes are estimated at 2.561 percent.

8. Clause H.9 provides:

has submitted no evidence to challenge its assertions, aside from argument by counsel, defendant characterizes the issue as one solely of contract interpretation and therefore ripe for summary judgment.

In this case the plain language of clause G.3 and Section I of the contract—the latter incorporating by reference FAR § 52.229-3—is controlling. Clause G.3 recites:

> Certain transactions which occur pursuant to this contract, for example, the purchase of materials or supplies, may be exempt from the imposition of state or local taxes. It is the contractor's responsibility to determine whether any transactions under the contract are exempt under the particular tax statute and to take advantage of any applicable exemptions. In addition, it may be useful for the contractor to inform the taxing authorities that the Maryland Procurement Office (MPO) is a federal government agency. In Maryland, it may be useful to inform Maryland taxing authorities that the MPO has been assigned Maryland State Tax Exemption Certificate Number 3000500 4. Putting the matter beyond cavil, FAR § 52.229-3(b), entitled Federal, State and Local Taxes, states: "The contract price includes all applicable Federal, State, and local taxes and duties."

> The Contractor shall provide the Contracting Officer with written notice of tax assessments whenever immunity of the Government from the tax could be an issue. The notice shall be submitted in sufficient time to provide the Government a meaningful opportunity to participate in negotiations or litigation with the taxing authority concerning the applicability of the tax.

9. If plaintiff's interpretation of clause G.3 were adopted, it also would curtail the application of clause H.9 and FAR § 52.229-3(h), as incorporated into the contract. Both provisions provide for possible immunity and apply in the event that an immunity exists. The need for these clauses would be reduced significantly if the NSA were *exempt entirely from state sales tax, because no* question of immunity would arise in this regard.

Furthermore, these clauses are decisive with regard to plaintiff's assertion that the NSA breached *the contract by refusing to permit* plaintiff to use its Maryland tax exemption certificate. FAR § 52.229-3(h) recites:
> The Government shall furnish evidence appropriate to establish exemption from any

Although the language of clause G.3—"the purchase of materials or supplies, may be exempt from the imposition of state or local taxes"—suggests to the contractor that a possibility of tax exemption may be available, the clause recites explicitly that "[i]t is the contractor's responsibility to determine whether any transactions under the contract are exempt under the particular tax statute and to take advantage of any applicable exemptions." Clause G.3 does not purport to suggest that the NSA is entirely tax exempt. FAR § 52.229-3(b) lays the matter to rest in any event: "The contract price includes all applicable Federal, State, and local taxes . . . ." Plaintiff's interpretation is unreasonable. If the court were to adopt plaintiff's interpretation of clause G.3, FAR § 52.229-3(b) would be rendered meaningless and the form of the contract would be altered from fixed-unit prices to one for reimbursement.[9]

Moreover, defendant is correct that the express language of clause B.2 defining the UPB prices presents no indication that sales tax was not incorporated: "The unit prices include all labor, material and equipment necessary to install one unit of a particular line item." In contrast to plaintiff's contention that it could rely upon the NSA's assertion of tax exemption, the interaction of the foregoing clauses places the burden on the

> Federal, State, or local tax when (1) the Contractor requests such exemption and states in writing that it applies to a tax excluded from the contract price and (2) a reasonable basis exists to sustain the exemption.

Pursuant to the foregoing clause and clause H.9, the NSA may participate in negotiations concerning tax exemption when, and if, such exemption exists. By letter dated February 15, 1994, the NSA denied plaintiff's request for a tax exemption letter "because the Tax Exemption clause is not applicable to the prepriced line items. Any sales tax on materials is already included in the prices in the [UPB]." The plain language of the contract does not state that the NSA is entirely exempt. The NSA's denial accorded with the plain language of the contract, as an exemption was not properly identified. Plaintiff has not raised a question of fact regarding whether sales tax was included in the UPB, or demonstrated that the NSA was obligated to provide plaintiff with a tax exemption letter for a specific exemption under this contract. Thus, plaintiff cannot show that defendant's refusal to provide the certificate of exemption was a breach of the contract.

contractor to determine which transactions, if any, are exempt, and to include all applicable taxes in the contract price. Plaintiff cannot shift the burden of ascertaining potential exemptions to the NSA.

### 2) Reformation

In the alternative, plaintiff, in seeking reformation of the contract, argues that the doctrines of mutual and unilateral mistake are applicable to the instant matter. Plaintiff bases its contentions on, *inter alia,* the PPR, Volume II, B.6, which makes evident that the coefficient factors include tax laws. Because it mistakenly concluded that the NSA was tax exempt and because the NSA did not alert plaintiff of this mistake, plaintiff seeks equitable relief for the omission of state sales tax in its contract bid coefficient.

■■■ "Reformation serves to bring the parties' written contract in accord with their agreement." *Atlas Corp. v. United States,* 895 F.2d 745, 750 (Fed.Cir.1990). "The purpose and function of the reformation of a contract is to make it reflect the true agreement of the parties on which there was a meeting of the minds." *American President Lines, Ltd. v. United States,* 821 F.2d 1571, 1582 (Fed.Cir.1987). "[I]n the absence of fraud, accident, mistake or illegality, a court of equity cannot change the terms of a contract." *Id.* (citing *Manufacturer's Fin. Co. v. McKey,* 294 U.S. 442, 449, 55 S.Ct. 444, 79 L.Ed. 982 (1935), and *Hedges v. Dixon County,* 150 U.S. 182, 192, 14 S.Ct. 71, 37 L.Ed. 1044 (1893)). A court should not decree reformation unless convincing evidence exists that the parties intended and agreed to the terms that the court is asked to enforce. *See Atlas Corp.,* 895 F.2d at 750.

■■■ "When there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties' actual intent, reformation . . . may be available to the adversely affected party." *Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 665 (Fed.Cir.1992). The party seeking reformation must show:

(1) [T]he parties to the contract were mistaken in their belief regarding a fact;

(2) that mistaken belief constituted a basic assumption underlying the contract;

(3) the mistake had a material effect on the bargain; and

(4) the contract did not put the risk of the mistake on the party seeking reformation.

*Atlas Corp.,* 895 F.2d at 750.

■■■ In support of its motion, defendant submitted the affidavit of Contracting Officer Robert M. DuCharme, whose

understanding of the [UPB] was that it represented an installed price for the particular unit of work. A unit of work given in the UPB is referred to in the contract as a "line item". For example, paragraph B.2 of the contract states that "the unit prices include all labor, material, and equipment necessary to install one unit of a particular line item". The coefficient did not, and should not have included tax as a component based on the [RFP]. The [PPR] dated 05 Feb. 1993 provides guidance to the offerors as to what elements a contractor should consider in calculating its coefficient. This document details to the offerors that as a "minimum" the coefficient should cover a variety of elements. The PPR was issued with the original solicitation package and discussed at the presolicitation conference. This documentation is consistent with information published by the U.S. Army Engineering & Housing Support Center, the center of expertise for Job Order Contracting (JOC). The taxes referred to in the PPR dated 5 Feb. 1993 as well as the U.S. Army documentation referred to herein clearly limits the tax component to employee payroll taxes, insurance, and business or corporate taxes.[10] Item 9 of the PPR further instructs the offerors to include any costs that they believe are associated with the work to be performed and are not covered by the [UPB] prices. I reviewed the proposals received from all three offerors, and saw consistency in their approach. Each offeror provided a breakdown of the elements

10. The inclusion of corporate taxes in the coefficient comports with the statements propounded by plaintiff in paragraph 12 of the complaint recited above.

they included in their respective coefficients. A review of the other offeror's proposals shows that they too only included costs for insurance and/or payroll taxes in their coefficient. There was no indication of abnormality that would have reasonably led me to the conclusion that [plaintiff] had made a mistake.

7. My understanding of the UPB was that it represented a completely installed price. The documentation published by various JOC authorities supports this understanding. The U.S. Army Engineering & Housing Support Center has published a manual on the Job Order Contract Process. This manual dated March of 1991 provides an understanding of the JOC unit prices. Under Section D–3 of this manual JOC unit prices are described as unit prices that "include only the costs of material and supply items required to install the materials, equipment, and labor needed for finished construction". Page D–5 states that "All prices in the UPB are for completed and in place construction unless explicitly described otherwise". Additional information supports this position and is provided by Project Time and Cost, the company responsible for developing the UPB used in the contract at hand. This document is entitled "Understanding Job Order Contract (JOC) Unit Prices", dated 15 May 1991. This document also states clearly that JOC unit prices include "only the costs of materials and supply items required to install the materials, equipment, and labor needed for finished construction". My understanding of the JOC UPB was that the prices contained therein represented completely installed price. This understanding is consistent with the documentation referenced above.

Affidavit of Robert M. DuCharme, Dec. 15, 1998, ¶¶ 6–7 (punctuation in original).

In response to defendant's arguments premised upon this affidavit, plaintiff submitted the affidavit of Tracy L. Knight, an attorney working for plaintiff's counsel of record. Ms. Knight relates a conversation with a company that authors UPBs. The company did not author the UPB at issue in this case, but produced UPBs for the same geographic region; the company conveyed to Ms. Knight that, in those UPBs that it had authored, sales tax was not included as a component factor. Based upon this information, plaintiff labels the NSA's position "untrue." Plf's Br. filed Feb. 26, 1999, at 2. However, plaintiff has not provided any direct evidence in support of its claim. Although plaintiff's evidence, which is hearsay, need not be admissible at trial, see Celotex, 477 U.S. at 324, 106 S.Ct. 2548, the fact that the company with which Ms. Knight spoke did not author the UPB in question renders plaintiff's assertion speculative. See Johns Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1359 (Fed.Cir. 1998). " 'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.' " Id. (quoting Anderson, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations omitted); see Young–Montenay, Inc. v. United States, 15 F.3d 1040, 1042–43 (Fed.Cir.1994) (finding conclusory, speculative affidavits insufficient to raise question of fact); Avia Group, 853 F.2d at 1560–61 (noting evidence must be more than merely colorable, and "a [party's] complaint that it needed discovery will not be heard on appeal when discovery was precluded by its own failure to seek Rule 56(f) protection"); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1301 (Fed.Cir.1986) (holding speculative statements insufficient); Pure Gold, 739 F.2d at 626–27 (discussing same).

Although maintaining that questions of fact have been raised, plaintiff at no time prior to oral argument moved for discovery pursuant to RCFC 56(g). During oral argument, counsel indicated that he did "not read [RCFC 56(g)] as a requirement" and "just did not know" that such a motion was required. Transcript of Proceedings, C.W. Over & Sons v. United States, No. 98–741C, at 34–35 (Fed.Cl. Apr. 20, 1999). While the court is sympathetic, the court previously has held that it is too late to invoke the procedures of RCFC 56(g) once briefing is completed. See Kollsman, A Div. of Sequa Corp. v. United States, 25 Cl.Ct. 500, 513 (1992); Scope Enters., Ltd. v. United States, 18 Cl. Ct. 875, 881 n. 1 (1989) ("As defendant points out in its reply, plaintiff failed to invoke the procedures of Rule 56(g), and it is too late to do so now that briefing is completed."); see

*also New Am. Shipbuilders,* 871 F.2d at 1081 (finding no abuse of discretion in trial court's ruling prohibiting plaintiff, which failed to move for discovery any time prior to end of briefing period, from asserting that discovery was necessary merely as means to avoid summary judgment); *Wackenhut Int'l, Inc. v. United States,* 40 Fed.Cl. 93, 106 (1998) (noting plaintiff's failure to move for discovery pursuant to 56(g) and granting defendant's motion for summary judgment upon finding plaintiff failed to dispute facts); *Crawford v. United States,* 3 Cl.Ct. 323, 329 (1983) (holding request for discovery at oral argument, in the absence of a motion pursuant to 56(f) or indication of evidence sought, insufficient to prevent the award of summary judgment); *cf. Burnside–Ott Aviation Training Ctr., Inc. v. United States,* 985 F.2d 1574, 1582 (Fed.Cir.1993) (finding that trial court, which converted defendant's motion to dismiss into one for summary judgment and permitted supplemental briefing, did not provide plaintiff adequate time to conduct discovery). Plaintiff's counsel is charged with knowledge of the court's rules and procedures.[11]

Plaintiff has not put forth any evidence that the NSA mistakenly believed that the agency was exempt from state sales tax. Nor has plaintiff offered evidence that the NSA was mistaken in its belief that the UPB already included sales tax. *See Glaverbel Societe,* 45 F.3d at 1562 (citing, *inter alia, Anderson* ); *Levi Strauss,* 742 F.2d at 1404 (stating argument by counsel is insufficient to raise issues of fact). Having failed to establish the requisite elements, plaintiff cannot invoke the doctrine of mutual mistake.

■■■■ Under the doctrine of unilateral mistake, "a contractor may obtain a remedy from the Government for a mistaken bid . . . only if the contracting officer knew or should

have known of the contractor's unilateral mistake at the time the bid was accepted." *Bromley Contracting Co. v. United States,* 794 F.2d 669, 671–672 (Fed.Cir.1986) (citing *Aydin Corp. v. United States,* 229 Ct.Cl. 309, 316, 669 F.2d 681, 686 (1982), and *Wender Presses, Inc. v. United States,* 170 Ct.Cl. 483, 485–86, 343 F.2d 961, 962–63 (1965)). To succeed, plaintiff must satisfy a two-part test. In addition to establishing knowledge on the part of the contracting officer, plaintiff must demonstrate that the error is compensable, *i.e.,* a "'clear cut clerical or arithmetical error, or misreading of the specification.'" *Bromley Contracting,* 794 F.2d at 672 ("Complete omission of a cost item from the bid calculation may be such a mistake, but no contractor can recover for an error in judgment.") (internal quotation and footnotes omitted).

■■■■ Defendant maintains that it neither knew, nor should have known, of plaintiff's misunderstanding. According to defendant, plaintiff's failure to include a factor for state sales tax in its coefficients did not indicate that plaintiff mistakenly interpreted the contract provisions because no other offeror included sales tax in its bid, and because the inclusion of sales tax within the UPB renders the exclusion of sales tax from the coefficient proper. Plaintiff, confronted with the foregoing arguments, has not put forth any evidence to suggest that the contracting officer knew of the alleged mistake; nor has plaintiff demonstrated that its error was compensable. *See Liebherr Crane Corp. v. United States,* 810 F.2d 1153, 1157 (Fed.Cir.1987) (noting that, while compensation may be had for clerical error or misinterpretation of specification, errors in judgment were not compensable). Having failed to satisfy the two-part test, the doctrine of unilateral mistake is not available to plaintiff. *See Glaver-*

---

11. Plaintiff did submit an RCFC 56(g) affidavit following oral argument as an attachment to its motion for reconsideration of the court's order suspending discovery. RCFC 83.2(f) provides that a motion for reconsideration of an order "shall be filed not later than 10 days after the date thereof." Plaintiff's filed its amended motion for reconsideration on April 28, 1999, almost 30 days after entry of the March 29, 1999 order. Plaintiff's motion was untimely. Although the court recognizes its discretion to deny

a motion for summary judgment when the better course would be to proceed to trial, the matter at hand presents issues of contract interpretation. *See Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996) ("Contract interpretation is an issue of law."); *Government Sys. Advisors, Inc. v. United States,* 847 F.2d 811, 813 n. 1 (Fed.Cir.1988) ("Contract interpretation is a matter of law and thus is amenable to decision on summary judgment.").

*bel Societe,* 45 F.3d at 1562; *Levi Strauss,* 742 F.2d at 1404.

Plaintiff also seeks reformation of the contract pursuant to FAR §§ 14–407–1 and 14–407–4. These provisions allow reformation of a sealed-bid contract upon discerning a mistake in the bid. The solicitation in this case was negotiated and thus falls properly under FAR § 15.508, which provides: "Mistakes in a contractor's proposal that are disclosed after award shall be processed substantially in accordance with the procedures for mistakes in bids at 14.407–4." To reform the contract plaintiff must demonstrate by clear and convincing evidence that "the mistake was (1) mutual, or (2) if unilaterally made by the contractor, so apparent as to have charged the contracting officer with notice of the probability of the mistake." FAR § 14–407–4(c). As noted previously, plaintiff has failed to sustain its burden. In the absence of evidence that the contracting officer made a mistake or knew of plaintiff's mistake, plaintiff cannot recover under these provisions.

### 3) *Patent ambiguity*

■ The contract provisions at issue are free from ambiguity. Per plaintiff's interpretation, however, the coexistence of the PPR, clause G.3, and FAR § 52.229–3 arguably presents an ambiguity regarding the function of sales tax within the context of the contract. The court must determine the significance of this ambiguity and whether it is patent or latent. If the ambiguity is so glaring as to place the contractor on notice, the patent ambiguity doctrine is applicable. *See Triax Pac.,* 130 F.3d at 1474–75; *Beacon Constr. Co. of Mass. v. United States,* 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 503–04 (1963); *see also Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996) (defining patent ambiguity as "obvious, gross, [or]

glaring"). "The existence of a patent ambiguity in a government contract 'raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation.'" *Triax Pac.,* 130 F.3d at 1474 (quoting *Fortec Constructors,* 760 F.2d at 1291). The duty requires the contractor to conduct an inquiry as to the correct meaning of the contract prior to submitting a bid. *See Newsom v. United States,* 230 Ct.Cl. 301, 303, 676 F.2d 647, 649 (1982). If a contractor fails to conduct such an inquiry, a patent ambiguity will be resolved against the contractor. *See id.* (noting "doctrine of patent ambiguity is an exception to the general rule of contra proferentem").

■ According to plaintiff, clause G.3 indicated that the NSA was exempt from sales tax. At the same time, plaintiff also read PPR clause B.6 as informing the contractor to include sales tax when factoring the coefficient. Although the court has concluded that the plain language of clause G.3 does not state that the NSA is tax exempt and that plaintiff bears the burden of determining when, or if, an exemption may apply, based upon plaintiff's interpretations of these provisions, a patent ambiguity existed when they are read in conjunction with FAR § 52.229–3.[12] The facial inconsistency presented by plaintiff's reading of these provisions should have prompted plaintiff to inquire of the contracting officer regarding sales tax prior to submitting its bid. Although not a large contractor, plaintiff "has been satisfying the needs of the Fort George Meade Military Intelligence for the last 25 years ... in secure facilities where security policies and procedures were of critical concern." Thus, per its own historical profile, plaintiff was familiar with this type of contract language and the process of inquiry through the contracting officer. Having failed to inquire or

---

12. Similarly, FAR § 52.229–3 has been found unambiguous: "This clause is not ambiguous; its provisions are, or should be, well understood by contractors doing business with the Government." *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 71 (1989). The Armed Services Board of Contract Appeals has also concluded that this provision is not ambiguous. In *Allied Painting & Decorating Co.,* 93–3 BCA ¶ 26,218, 1993 WL 266790 (1993), the board found that plaintiff's interpretation of exemption from state

sales tax would render useless the inclusion of FAR § 52.229–3, which indicated expressly that the contract price was to include all Federal, State, and local taxes. *See Fields Roof Serv., Inc.,* 90–3 BCA ¶ 23,232, at 116,579, 1990 WL 118748 (1990) ("We find no ambiguity here. Contract language that was incorporated by reference clearly and unequivocally stated that the contract price included all applicable Federal, State, and local taxes and duties.").

rectify this inconsistency, plaintiff cannot ask that any ambiguity be construed in its favor.

In sum, plaintiff failed to present sufficient evidence that a genuine dispute exists as to any material fact regarding its claim for reimbursement of sales tax. The plain language of the contract indicates that it was plaintiff's burden to assess what materials, if any, fell under the tax exemption provision. The record does not disclose either a unilateral or mutual mistake. Moreover, the patent ambiguity that results from plaintiff's construction of the contract language must be construed against plaintiff for failing to discharge its duty to inquire. Defendant's motion for summary judgment with regard to Count I of the complaint is granted.

### 4. Equitable adjustment for lost coefficient on small delivery orders

The second issue calls into question whether plaintiff's performance of work orders under $2,000.00 was beyond the scope of the contract. If the contract required a $2,000.00 minimum for delivery orders, the NSA inappropriately applied the contract coefficient, which was based on a minimum of $2,000.00, to work orders not meeting this threshold, and plaintiff would be entitled to an equitable adjustment.

According to plaintiff, it was not required to perform work orders below $2,000.00 based on clause 1.4 of the contract: "When the Government requires supplies or services covered by this contract in amount of less than $2,000.00, the Government is not obligated to purchase, nor is the contractor obligated to furnish, those supplies or services under the contract." Defendant posits, however, that this clause applies to delivery orders, not small work orders, and that the contract required performance of the small work orders in question.

The parties dispute whether each work order was separate, distinct, and executed bilaterally by the parties. Correspondence between the parties regarding these small work orders raises the question whether the orders were to be performed individually or bundled together and performed when the total amount reached $2,000.00. Plaintiff's May 4, 1994 letter to Contracting Officer DuCharme acknowledges that "[plaintiff] has agreed to accept small requirements with a value of less than $2,000.00, which is a lower limit than contained in the contract." However, in Contracting Officer Doring's April 15, 1994 memorandum to Mr. Cobb, the Contracting Officer's Representative, the Government and plaintiff agreed to "bundle work orders until they meet the $2,000.00 threshold for individual delivery orders." Notwithstanding this memorandum, Mr. Cobb continued to issue individual work orders under $2,000.00.

Because the record raises questions of material fact as to whether the contract required plaintiff to perform work orders under $2,000.00, summary judgment on Count II is not appropriate.

### 5. Application of an improper coefficient

Plaintiff's third and final claim concerns the NSA's application of coefficients for modifications to delivery orders 0168, 0192, 0193, 0198, 0204, 0207, 0232, and 0135. Germane to the resolution of this issue are the Coefficients Clause, B.2 and the Ordering Clause, H.21. Clause B.2 provides:

The contractor shall provide three fixed coefficients for the Base and each of the four Option Periods that will be applied to the pre-determined prices established in the Unit Price Book; one for Normal Working Hours, one for other than Normal Working Hours (Overtime), and one for Flyaway Services. A "coefficient" is a numerical factor that represents the contractor's direct and indirect costs and profit over and above the fixed prices established in the Unit Price Book. The unit prices include all labor, material and equipment necessary to install one unit of a particular line item. The coefficients will be used to price the cost of each Delivery Order by multiplying the applicable coefficient by the unit prices and quantities. The coefficients must include all associated costs that are not included in the Unit Price Book. Each coefficient may be different for each contract period to account for anticipated fluctuations in economic conditions; however, they will be fixed for the Base Period and all Option Periods, and

the Government will make no allowances for any prices other than the non-pre-priced item unit prices. . . .

Additionally, clause H.21.g, states:

The base prices determined will be multiplied by the number of work units required to determine the extended base unit price, which will be converted to the delivery order firm-fixed price by multiplying the extended base unit price by the appropriate *current* contractor's coefficient.

(Emphasis added.)

Because the modifications to delivery orders 0168, 0192, 0193, 0198, 0204, 0207, 0232, and 0135 can be viewed only as new work orders, the NSA incorrectly applied expired coefficients. In these circumstances a delivery order has been issued for a subsequent period with altered terms. Plaintiff is not engaging in any pre-existing performance, but, rather, is undertaking a new or related task, which is being performed during a different time period. Defendant argues unpersuasively that these are not new orders requiring application of the coefficient applicable at the time of performance. This is not a situation in which plaintiff is seeking an adjustment for work that was to be performed within a specific time frame and performance occurred at a later date. Because defendant's interpretation is unreasonable, its motion for summary judgment is denied with regard to Count III of the complaint.[13] Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion for summary judgment is granted as to Count I of plaintiff's complaint and is denied in all other respects.

2. By June 11, 1999, the parties shall file a Joint Status Report proposing a deadline for discovery and schedule for further proceedings.

3. Plaintiff's Amended Motion for Reconsideration is denied.

---

**13.** Plaintiff has declined to move for summary judgment, thereby preventing resolution of this