Martha McGOWAN, Petitioner,

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–2446V.

United States Court of Federal Claims.

Aug. 4, 1994.

David W. Cooney, Hartford, CT, for petitioner.

Karen P. Hewitt, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

### *ORDER*

NETTESHEIM, Judge.

This matter is before the court on petitioner's motion for review of a decision dismissing a petition under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 to 300aa–34 (1988 & Supp. IV 1993), also codified *as amended* at 42 U.S.C.A. §§ 300aa–1 to 300aa–34 (West 1991 & Supp.1994) (the "Vaccine Act"). The issue

to be decided is the meaning of the word "return" as contemplated by 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III) (1988), to establish jurisdiction under the Vaccine Act in respect of an injured person who has returned to the United States no later than six months after vaccination. Argument is deemed unnecessary.

## FACTS

The following facts as found by the special master are fully supported by the record. Martha McGowan ("petitioner") was born in the United States on October 5, 1964. On August 20, 1965, while in Canada where her father was furthering his medical training in pediatric surgery, petitioner received a measles vaccination. Petitioner was hospitalized for convulsions at the Hospital for Sick Children in Toronto, Canada, from August 27–31, 1965. The admission history indicates that petitioner had received the measles vaccine one week prior to admission. Before admission petitioner had developed a slight fever, vomited, and was found semicomatose with twitching hands and urinary incontinence. By the next morning, she had recovered completely, her convulsions had stopped, and her EEG was normal.

Petitioner suffered more convulsions in January 1966, seven days after receiving a smallpox vaccination. Petitioner was again admitted to the Hospital for Sick Children from January 4–7, 1966, and was diagnosed with a temporal lobe seizure disorder and minimal cerebral dysfunction.

During the next two years, while her father was completing his medical residency, petitioner lived in Toronto with her family, taking intermittent trips to upstate New York to visit her maternal grandparents. At least one of these visits occurred within six months of her August 1965 vaccination and convulsions. Petitioner permanently returned to live in the United States with her family in April of 1967.

On October 1, 1990, petitioner filed an application for compensation under the Vaccine Act. Petitioner alleges that she suffered an encephalopathy as a result of a measles vaccination administered in August 1965 in Toronto, Canada.

Respondent moved to dismiss the petition based on petitioner's failure to satisfy the evidentiary requirement of the Vaccine Act that she "returned" to the United States not later than six months after she received the vaccination. 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III) provides that a person who suffered an injury set forth in the Vaccine Injury Table may qualify for compensation when the person "received the vaccine outside the United States or a trust territory and the vaccine was manufactured by a vaccine manufacturer located in the United States and such a person returned to the United States not later than 6 months after the date of the vaccination." Respondent does not contest that the vaccine was manufactured in the United States.

Special Master Richard B. Abell initially denied respondent's motion on December 29, 1992. His order stated: "Petitioner is advised, however, that this does not mean that it has been established that a 'return' was made within the meaning of the statute, only that there is an insufficient basis upon which to grant a motion to dismiss." *McGowan v. Secretary of DHHS*, No. 90–2446V (Spec.Mstr. Dec. 29, 1992) (order denying motion to dismiss).

As it became clear that the case involved tuberous sclerosis ("TS"), Special Master Abell transferred the case to Special Master Laura D. Millman, who handles all TS cases within the Office of Special Masters. In the order transferring the case to Special Master Millman, Special Master Abell wrote, "I do not alter my opinion that petitioner returned within the meaning of the statute. Subsequent argument and evidence may alter this ruling." *McGowan*, No. 90–2446V (Spec.Mstr. Oct. 6, 1993) (transfer order).

On May 10, 1994, after receiving renewed briefing and hearing argument on the issue of whether petitioner "returned" to the United States within the meaning of the statute, Special Master Millman granted respondent's renewed motion to dismiss for failing to prove, by a preponderance of the evidence, that petitioner returned to the United States within six months of her measles vaccination.

*McGowan,* No. 90–2446V, slip op. at 11 (Spec.Mstr. May 10, 1994).

## DISCUSSION

### 1. *Standard of review*

■ This motion implicates summary judgment, because both parties rely on the administrative record, and the special master found that petitioner failed to meet her burden of proof that she came within the jurisdictional requirements of the Vaccine Act. However, a motion for summary judgment based on lack of jurisdiction is treated as a motion to dismiss under RCFC 12(b)(1). *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). Evidentiary material regarding the visits of petitioner to the United States is found in respondent's answers to interrogatories. Each trip lasted approximately three to four days and always was made to visit family in upstate New York, except for one trip during which Dr. McGowan sat for his surgical boards. One of the trips lasted one month.

■ The Court of Federal Claims may only set aside a finding of fact or a conclusion of law of a special master that is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 42 U.S.C.A. § 300aa–12(e)(2)(B) (West Supp. 1994). In reviewing legal questions, the standard test is whether the ruling is "not in accordance with law," and a de novo analysis is undertaken. *Neher v. Secretary of DHHS,* 984 F.2d 1195, 1198 (Fed.Cir.1993). Since this case deals with the legal question of whether or not petitioner "returned" to the United States under the meaning of 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III), it must be reviewed de novo to determine whether the special master's decision is in accordance with the law.

### 2. *Law of the case*
#### 1) *Vaccine Rule 8(f)*

■ Petitioner argues that the transferee special master could not revisit (upon a new motion) the transferor special master's earlier decision not to grant respondent's motion to dismiss for lack of jurisdiction.

Respondent counters that petitioner had waived her right to raise the argument of law of the case under Vaccine Rule 8(f), which provides:

> Any fact or argument not raised specifically in the record before the special master shall be considered waived and cannot be raised on review of a special master's decision. This rule shall not apply to legal arguments raised by the party that stands in the role of the appellee on review.

Petitioner did not raise the argument that law of the case bars review of the transferor special master's decision before the transferee special master, despite submitting a rebriefing regarding the renewed motion to dismiss. No mention of this argument appears in the record compiled before the special masters. Thus, Vaccine Rule 8(f) forecloses consideration of petitioner's argument based on law of the case. In order to address fully petitioner's objections, however, the court proceeds to discuss law of the case.

#### 2) *The law of the case doctrine*

■ The law of the case doctrine does not affect the power of a court to reconsider its interlocutory decisions. The court may change any interlocutory decision up until the entry of final judgement. *Jamesbury Corp. v. Litton Indus. Products, Inc.,* 839 F.2d 1544, 1550 (Fed.Cir.1988); *see Perez Ruiz v. Crespo–Guillen et al.,* 25 F.3d 40, 41–42 (1st Cir.1994); 1B *Moore's Federal Practice* ¶ 0.404[4.–1] (2d ed. 1993). This law of the case doctrine applies when a case is transferred to another judge within the court. *See* 1B *Moore's Federal Practice* ¶ 0.404[4.–2]. It is true that, to avoid a reconsideration of every previously decided issue, the practice is to treat each decision as law of the case, departing from it only for certain reasons, such as new evidence, supervening law, or a clearly erroneous decision. This remains merely a practice, however, and does not limit the court in reviewing its own decisions. *Jamesbury,* 839 F.2d at 1550.

Moreover, the order issued by the transferor special master states, "I do not alter my opinion that petitioner returned within

the meaning of the statute. Subsequent argument and evidence may alter this ruling." *McGowan*, No. 90–2446V (Spec.Mstr. Oct. 6, 1993) (transfer order). This language does not impart a sense of finality such that law of the case should preclude the transferee special master from re-examining the issue. In fact, the inclusion of this caveat in the transfer order implies that the new special master was not restricted by the law of the case.

 Whether or not the transferee special master erred in revisiting the earlier decision, this court deems it prudent to resolve the issue of whether or not petitioner "returned" to the United States under 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III). On review the question is not whether the transferee judge should have deferred to the transferor judge, but whether the ruling was correct. *Williams v. Commissioner*, 1 F.3d 502, 503 (7th Cir.1993).

### 3. Meaning of "return" under 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III)

Only the meaning of "return" in 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III) is in question. The issue regarding the definition of "return" is whether there is a sense of permanence inherent in the word. Petitioner and respondent agree that a physical entry into the United States is necessary to start a "return." Their disagreement lies in the amount of time the injured person must stay or intend to stay after this initial entry. Petitioner argues that a return is completed with the initial entry. Whether the injured person stays for a few hours, a few weeks, or forever would make no difference, as long as the injured person has set foot in the United States. Respondent rejoins that this interest is contrary to the intent of Congress, and that, at least for purposes of this case, a "return" requires at least an intention to remain, from that moment on, as a permanent resident of the United States.

 The first step in determining the scope of a statute is to give words their ordinary meaning, as it is assumed that the legislative purpose is reflected by the ordinary meaning of the statutory language. *Moskal v. United States*, 498 U.S. 103, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990); *Goodwin v. Secretary of DHHS*, 27 Fed.Cl. 1, 3 (1992); *see INS v. Phinpathya*, 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984). This should be done with deference to the principle that "a court should give effect … to every clause and word of a statute." *Moskal*, 498 U.S. at 109–110, 111 S.Ct. at 466.

Although the parties offer numerous examples of the plain meaning of "return," the many dictionary definitions shed little light on the issue of whether an aspect of permanence is involved in the statute's meaning or whether a physical return of any length of time is sufficient. Since the word "return" relies on its context in order to impart a sense of permanence, the plain meaning rule is not dispositive.

The legislative history of the statute must be consulted in order to determine which meaning the court should attach to "return." *See Goodwin*, 27 Fed.Cl. at 4. The word "return" itself is not addressed in any of the legislative history concerning this statute. Thus, the purpose of Congress' enactment of the Vaccine Act must be understood to guide the court's understanding of "return" under the statute. *See Amendola v. Secretary of DHHS*, 989 F.2d 1180, 1182 (Fed.Cir.1993).

Congress was faced with a crisis in the administration of various childhood vaccination programs. Some of the programs resulted in the injury or death of children recently inoculated. On one hand, vaccine manufacturers were dealing with increasing litigation costs to defend against claims resulting from these injuries. These costs, combined with the costs of settlement or damages awarded, caused many manufacturers to consider withdrawing from the vaccine market. On the other hand, causation was often difficult to prove, leaving the injured child or his family left with no compensation under the traditional tort system.

 Thus, Congress had two goals in enacting the Vaccine Act. The first goal was to "offer fair compensation to victims" injured in connection with childhood vaccination programs. H.R. 1780, 99th Cong., 1st Sess. (1985); S. 827, 99th Cong., 1st Sess. (1985); H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1,

at 7 (1986), U.S.Code Cong. & Admin.News 1986, pp. 6287, 6348. The second was to insure the "continued supply of vaccines that are vital to the public health." H.R. 1780; S. 827; H.R.Rep. No. 908. This second goal is linked only to the supply of vaccines in the United States.[1] The legislative history does not consider one of these goals more important than the other.

The scope of the Vaccine Act does not extend beyond the borders of the United States. The name itself refers to a "national" act. The legislative history does not address any concern for the continued supply of vaccines outside the United States or the compensation of non-residents of the United States, save for United States Government and military personnel stationed abroad. Certain citizenship or location restrictions were proposed in order to limit the reach of the statute in this regard.[2]

The statute allows two exceptions to this restricted scope. First, families of citizens who were employees of the United States or members of the armed forces can petition for compensation under the Vaccine Act, even if the vaccine was received outside the United States or its territories. 42 U.S.C. § 300aa–11(c)(1)(B)(i)(II). Second, as noted above, anyone may petition who received a vaccine made in the United States and who subsequently returned to the United States not later than six months after the vaccination. 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III). By its wording this exception applies only to those who previously had lived in the United States and "returned."

An injured person who does not intend to return to live in the United States should not be able to petition for a claim. Such an individual is not subject to the civil tort system of litigation in the United States. As well, the person is not required to obtain the vaccinations by any United States childhood vaccination program. Finally, as mentioned earlier, Congress did not indicate a concern about the availability of vaccines in foreign countries.

Those persons who previously had lived in the United States and knew that they would subsequently return (aside from its being a prudent health measure) most likely received vaccines outside the United States in order to comply with American childhood vaccination programs. They foresaw returning to the United States in the near future and, thus, a need to comply with United States vaccination regulations to which they would be subject upon their return. There is no guidance as to why Congress drew a line at six months, yet Congress did so and the court must honor it. *See Amendola*, 989 F.2d at 1182.

"[A] court should seek to avoid construing a statute in a way which yields an absurd result and should try to construe a statute in a way which is consistent with the intent of Congress." *Hellebrand v. Secretary of DHHS*, 999 F.2d 1565, 1570–71 (Fed.Cir. 1993). To rule that "return" means simply to physically enter the United States is to invite absurd scenarios. As the transferee special master noted, such a construction would allow expatriate Americans who have emigrated to other countries or non-citizens who have visited the United States merely to return and spend the day in the United States eligibility to petition and take advantage of the compensation program's ease and funding. *McGowan*, 90–2446V, slip op. at 9

---

1. The legislative history refers to the national supply of vaccines when discussing the goal of keeping vaccines available. The aim is "to protect the adequacy of the Nation's supply of vaccines." 132 Cong.Rec. H30760 (daily ed. Oct. 14, 1986) (statement of Rep. Waxman). This was reiterated in a House Report which stated the purpose was "to ensure that the Nation is able to maintain safe and reliable childhood vaccination programs." H.R.Rep. No. 908, 99th Cong., 2d Sess., at 7 (1986), U.S.Code Cong. & Admin.News 1986, p. 6348.

2. H.R.Rep. No. 908 provides, as follows:

 *Subsection (c)—Petition Content.*—A petition must contain a variety of materials necessary to make a finding that compensation is to be made. These materials include evidence that the person on behalf of whom the petition is filed (hereinafter referred to as "the petitioner")—

 . . . .

 . . . met certain citizenship or location restrictions; . . .

 H.R.Rep. No. 908 at 15, U.S.Code Cong. & Admin.News 1986, p. 6356.

(Spec.Mstr. May 10, 1994).[3] It defies logic that Congress would intend "return" to allow a physical presence without any intent to remain or any duration requirement, especially where the potential of affording compensation to visitors to the United States is present.

In light of the two purposes Congress intended the Vaccine Act to serve and the possibility of compensation to mere visitors to the United States, the word "return" in 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III) means a permanent return to the United States and not a physical presence for any fleeting period of time.

Petitioner also contends that since the Vaccine Act is a remedial statute it must be construed to provide compensation to injured persons whenever possible. The legislative history does say that the compensation system is to be expeditious and fair. H.R.Rep. No. 908 at 12, U.S.Code Cong. & Admin.News 1986, p. 6353. Yet, this remedial aspect of the Vaccine Act refers to those claims that meet its jurisdictional requirements. Only those petitioners who are eligible under the Vaccine Act can avail themselves of the remedial nature of the Vaccine Act.

 "The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). When dealing with issues of jurisdiction, as in this case, the statute must be construed strictly, as it is a limited waiver of sovereign immunity. *See Edgar v. Secretary of DHHS,* 29 Fed.Cl. 339, 345 (1993); *Patton v. Secretary of DHHS,* 28 Fed.Cl. 532, 535 (1993). The court cannot expand on the waiver of sovereign immunity explicitly stated in the statute. *Broughton Lumber Co. v. Yeutter,* 939 F.2d 1547, 1550 (Fed.Cir.1991). In order to avoid inadvertently expanding on this limited waiver of sovereign immunity,

the language of the statute must be construed with a "sense of conservatism." *Sherwood,* 312 U.S. at 590, 61 S.Ct. at 771; *Broughton,* 939 F.2d at 1552. Congress unequivocally expressed that the compensation program of the Vaccine Act is not be available to those who do not return to the United States within six months. In keeping with the doctrine of limited waiver of sovereign immunity, the court cannot embellish the six-month requirement.

 As Congress meant that "return" would mean a permanent return, an injured person must return to the United States within six months of the vaccination date, with the intention to remain permanently from that point on, in order to be able to participate in the compensation program. Petitioner did not return permanently to the United States for a number of years. In fact, some question existed at the time of vaccination whether the family could return to the United States, despite an expressed intention to do so.[4] Thus, petitioner has failed to "return" within the meaning of 42 U.S.C. § 300aa–11(c)(1)(B)(i)(III) and fails to meet the jurisdictional requirements of the Vaccine Act.

## CONCLUSION

Based on the foregoing, the decision of the special master is sustained. The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

No costs on review.

---

3. This court has found that, with regard to pending civil actions, the Vaccine Act manifests a legislative intent to prevent double compensation. *Goodwin v. Secretary of DHHS,* 27 Fed.Cl. 374, 376 (1992). Logic dictates that Congress would not intend to allow the opportunity for double compensation when the petitioner could be compensated outside the United States.

4. "Dr. McGowan did not know whether he ultimately would obtain permission from the Immigration Service allowing him to return to the United States...." Aff. of Margaret and George McGowan, May 21, 1993, ¶ 8 (answers to interrogatories).