C.W. OVER & SONS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–741C.

United States Court of Federal Claims.

Dec. 18, 2000.

Francis R. Laws, Baltimore, MD, for plaintiff.

Phyllis Jo Baunach, Washington, DC, with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION

MILLER, Judge.

This contract case is before the court on defendant's motion for summary judgment as to Count II of the complaint. A contractor seeks damages incurred when the Government refused to allow aggregation or bundling of small work projects, so that the contractor was required to perform jobs under $2,000.00 at any one time, instead of in groups aggregating at least $2,000.00. The issues to be decided are (1) whether the law of the case doctrine prevents summary judgment after this court denied defendant's prior summary judgment motion on the ground that genuine issues of material fact were present; (2) whether the contract can be interpreted as requiring bundling of orders for less than $2,000.00; (3) if the contract does not require bundling, whether the parties agreed to administer the contract differently such that plaintiff may be entitled to damages. Argument is deemed unnecessary.

## FACTS

The following facts have been established in the prior proceedings or on this motion. On January 14, 1994, the Maryland Procurement Office of the National Security Agency (the "NSA") awarded Contract MDA904–94–D–2502 to C.W. Over & Sons, Inc. ("plaintiff"). This firm fixed-price contract was an indefinite delivery, indefinite quantity job order contract ("JOC") providing for construc-

tion and renovation work at Fort George G. Meade, Maryland. The duration of the contract was one year with four one-year options. All but the final option year of the contract were exercised. Count II of plaintiff's complaint alleges that the NSA breached its obligation to bundle work orders for under $2,000.00. Only those facts pertinent to the pending motion are recited.[1]

1. *Orders and pricing*

The contract establishes a formula to set the price of work ordered by the NSA. The contract incorporates by reference a Unit Price Book ("UPB") to determine the costs of each potential undertaking. A UPB is a comprehensive register of individual construction tasks that the Government has pre-priced. The price of a particular task is established by cross-referencing the task performed with the UPB cost entry and multiplying by the relevant coefficient.[2] The coefficients thus operate as multipliers in calculating the price that plaintiff was entitled to charge for work performed. At the outset plaintiff was required to provide the NSA with three fixed coefficients—for onsite work during normal working hours, onsite work during other than normal working hours (overtime), and offsite work—for each year of the contract. Although the coefficients changed for each successive year of the contract to account for differing economic conditions, they remained fixed during the year for which each was designated. Plaintiff's proposed coefficients were incorporated into the contract upon award.

The contract also establishes a procedure for ordering new work. The two vehicles employed for this purpose were (1) delivery orders and (2) modifications to delivery orders. Delivery orders were used to initiate separate projects within the contract. Various sections of the JOC relate to ordering procedures and applicable rules. Section

---

1. A more complete rendition of the facts of this case can be found in *C.W. Over & Sons, Inc. v. United States*, 44 Fed.Cl. 18, 20–22 (1999) (order granting as to Count I and otherwise in part motion for summary judgment); and *C.W. Over & Sons, Inc. v. United States*, 45 Fed.Cl. 502, 504 (1999) (order granting partial summary judgment on Count III).

2. Section B.2 of the contract defines a coefficient as "a numerical factor that represents the contractor's direct and indirect costs and profit over and above the fixed prices established in the [UPB]."

H.21 of the contract, entitled "ORDERING," details the process for issuing delivery orders. Section F.6, "MPO 216–9002 ORDER-ING (APR 1989)," provides that "[a]ll Delivery Orders issued hereunder are subject to the terms and conditions of this contract. This contract shall control in the event of conflict with any Delivery Order." Delivery order limitations are found in section I.4, which states, in part:

When the Government requires supplies or services covered by this contract in an amount of less than $2,000.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

Additionally, section I.5 required the NSA to order at least the amount of "supplies or services designated in the Schedule as the 'minimum,' " as well as required plaintiff to provide supplies and services up to and including the "maximum."

In pre-award discussions with offerors for the JOC, the NSA mentioned the issuance of requirements for work of less than $2,000.00 under large umbrella or "Omnibus" delivery orders, with the implication that bundling was a possibility. For example, the June 8, 1993, JOC pre-bid conference agenda contained a bullet point stating "Omnibus jobs— small requirements (bundling, but quick response . . . .)" The minutes from the pre-bid conference recorded that "[s]mall jobs costing less than $2,000 may be bundled together and issued under one delivery order." The JOC Proposal Evaluation Clarification Questions posed to plaintiff included an inquiry into how plaintiff intended "to satisfy the small projects requirements (under $2,000.00), as discussed in the pre-bid conference," apparently reinforcing the earlier references to bundling. The NSA issued the first "Omnibus" delivery order, DO 001, on February 10, 1994. DO 001 "placed funds on the contract" to perform small dollar requirements, defined as work less than $5,000.00, during the contract's base year. The NSA issued work orders under DO 001 as projects with lower costs arose.

Although the contract did establish a procedure for ordering new work, it did not establish a specific process by which the parties would agree on what work was necessary for a particular project. In practice the parties followed the same basic negotiating steps. After the NSA had identified its project requirements, plaintiff would prepare a proposal that included a listing of the line items necessary for performance. Plaintiff would cross-reference the required line items with the UPB, multiply by the relevant coefficient, and add the amounts to obtain a total price for the project. As was its custom, the NSA concurrently would prepare its own independent cost estimate. When plaintiff's proposal was received, the NSA would review it against its own estimate. Next, the parties would meet to discuss any discrepancies or outstanding technical issues. Any changes agreed to would be incorporated into plaintiff's proposal. Thereafter, the NSA would issue a work order consistent with the agreed-to terms.

Early into the contract performance, the manner in which orders for small work requirements would be processed became an issue. On March 7, 1994, plaintiff's Project Manager, Walt Wilson, and David Cobb, the Contracting Officer's Representative (the "COR") for the JOC, signed a memorandum entitled "Small Requirements Process Test Phase." This memorandum memorialized an agreement to a three-month trial period for certain guidelines in processing and performance of small requirements.[3] The process allowed for plaintiff to use a phoned-in estimate, rather than a "walk out," and throughout the trial period appropriate adjustments were to be made as necessary. While an "implementation occurred," the agreed upon trial process outlined in the March 7 memorandum was never followed.

Small work requirements remained an issue during the first year. In particular, plaintiff had to balance the hardship of lost profits from small orders with the need to complete work for less than $2,000.00 in a timely manner.[4] A few months into the con-

3. The agreement memorialized was reached on March 3, 1994, at a meeting attended by Charles

W. Over, Jr., Messrs. Wilson and Cobb, and Dave McKeldin, Sr., another COR.

4. From plaintiff's perspective, performing work

tract, plaintiff received delivery orders from the NSA for under $2,000.00. Charles W. Over, Jr., plaintiff's president, raised the issue of work orders that were less than $2,000.00 with Mark Doring, a contracting officer for the JOC. Mr. Doring told Mr. Over that Mr. Cobb should bundle the less expensive work requests into $2,000.00 increments. Plaintiff continued to receive work requests under $2,000.00, and on April 12, 1994, plaintiff returned five small work requests in protest because they were under $2,000.00.

On April 13, 1994, Contracting Officers Doring and Robert DuCharme, COR Cobb, and representatives of plaintiff met to discuss the conflict. Mr. DuCharme directed Mr. Cobb to bundle work requests into $2,000.00 increments. Mr. Cobb did not comment on Mr. DuCharme's order during the meeting, but as Mr. Cobb was leaving, he indicated to Mr. Over that he did not intend to bundle the small work. Mr. Over then informed Mr. DuCharme of his interaction with Mr. Cobb.

On April 15, 1994, Contracting Officer Doring sent a memorandum to Mr. Cobb stating that, as a result of the April 13, 1994 meeting, the NSA and plaintiff had agreed to process small requirements in the following manner:

> For requirements between $0.00 and $2,500, the contractor shall use R.S. Means to estimate jobs and submit the estimates to the Government for review and approval. R.S. Means shall be used until CACES is made available to the contractor.... L584 will bundle work orders until they meet the $2,000.00 threshold for individual delivery orders, and when possible, bundle them for work in the same areas (building complexes).[5]

A copy of the memorandum was sent to plaintiff with a note stating, "[H]ere's a copy of the memo that went to Dave Cobb's office on our agreement on small requirements."

Despite the directive, Mr. Cobb did not bundle the small requirement work orders less than $2,000.00, nor did Mr. DuCharme insist that he do so. Plaintiff performed such work orders using R.S. Means to estimate the jobs for the remainder of the first contract year.

The parties' subsequent discussions resulted in the development of procedures later reduced to writing in section H.28, "Small Requirements Work Order Process." Section H.28 was issued as part of DO 0043 on October 21, 1994, which was executed bilaterally by both parties. The process divided the small requirements work orders into three pricing increments: projects less than $2,500.01, projects from $2,500.01 through $5,000.00, and projects from $5,000.01 through $25,000.00. Regarding work orders for less than $2,500.01, the pertinent pricing for Count II, section H.28 provided that R.S. Means could be used, no vendor quotes or "walk-outs" would be required, and the work would be completed in five working days or less. The parties later incorporated the same provision into two other omnibus delivery orders issued regarding small requirements, DO 0135 and DO 0210, which together covered 1995 through 1997.

Plaintiff contends that the NSA's failure to bundle work orders and continued issuance of work orders valued under $2,000.00 resulted in a loss of $264,992.00. This loss stemmed from the application of plaintiff's coefficient to work projects that plaintiff claims it was not required to perform under the contract. Plaintiff maintains that the cost of site inspection, estimates, and performance increased markedly for jobs under the $2,000.00 threshold and that such costs could not be covered by the proposed coefficient. Thus, plaintiff seeks an equitable adjustment totaling $264,992.00 for the issuance of work orders under $2,000.00 in violation of the contract.

---

for less than $2,000.00 would create a loss due to resources expended to estimate, set up, and actually perform. However, delaying small work projects until work in a particular area exceeded $2,000.00 presented certain logistical difficulties for the NSA.

**5.** L584 is the technical organization at Fort Meade responsible for facilities engineering. R.S. Means is a construction industry manual which contains standardized estimates for various construction projects.

### 2. *Procedural history*

On February 20, 1998, plaintiff submitted a certified claim to the contracting officer for costs incurred during the course of performance on the contract. On July 20, 1998, the contracting officer denied this claim in its entirety. Plaintiff filed suit seeking review of that decision pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a)(1) (1994 & Supp. IV 1998).

In its suit plaintiff raised three independent grounds for recovery. Count I of plaintiff's complaint dealt with whether the contract price, as awarded, included all state sales tax on materials. Count II concerned whether plaintiff's performance of work orders under $2,000.00 was beyond the scope of the contract. In Count III of the complaint, plaintiff challenged the use of coefficients for work orders performed during the option years, charging that the NSA often applied the previous year's coefficient rather than the current year's.

On January 4, 1999, defendant responded to the complaint with a motion for summary judgment. That motion was granted with respect to Count I, but otherwise denied. *See C.W. Over & Sons,* 44 Fed.Cl. 18 (1999) (order granting in part and denying in part motion for summary judgment). As to Count III, defendant argued that it, in fact, had applied the correct coefficients. The court rejected this contention, *see id.* at 31–32, inviting plaintiff to move for summary judgment.

On July 7, 1999, plaintiff moved for partial summary judgment with respect to Count III of its complaint. Plaintiff argued that, having ruled that the new work orders were properly viewed as delivery orders, not as modifications to delivery orders, and that the NSA applied expired coefficients, the doctrine of the law of the case required the court to hold in its favor. Defendant opposed and cross-moved for partial summary judgment contending that plaintiff misinterpreted the court's ruling on defendant's prior motion for summary judgment and that, in any event, 48 C.F.R. (FAR) § 52.243–4(e) (1999), foreclosed plaintiff from recouping its losses.[6] On

December 10, 1999, the court denied plaintiff's motion, granting defendant's motion for partial summary judgment with respect to Count III. *See C.W. Over & Sons,* 45 Fed. Cl. at 507 (1999) (order granting defendant's motion for partial summary judgment). Defendant now has renewed its motion for summary judgment with respect to Count II.

### DISCUSSION

### 1. *Summary judgment standard*

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and there are no disputes over material facts that may significantly affect the outcome of the suit. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The moving party bears the burden of demonstrating the absence of genuine disputes over material facts, however this burden may be discharged if the moving party can show there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.; see H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that nonmoving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). Although summary judgment is designed " 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1); *see Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d

---

**6.** In its prior motion for summary judgment on this count, defendant argued only that the cor-

rect coefficients had been applied and did not raise an issue with respect to FAR § 52.243–4.

1557, 1560 (Fed.Cir.1988), a trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## 2. *Law of the case*

■ As a preliminary issue, plaintiff contends that the court's denial of defendant's prior motion for summary judgment as to Count II has become the law of the case. According to plaintiff, defendant should have filed a motion to reconsider within ten days of the denial of the original ruling, rather than renewing its motion for summary judgment. Plaintiff characterizes defendant's renewed motion as a "nullity." Pl.'s Br. filed Sept. 1, 2000, at 8. Absent special circumstances, the law of the case doctrine disfavors the practice of reconsidering what has already been decided. *See, e.g., Mendenhall v. Barber–Greene Co.*, 26 F.3d 1573, 1582 (Fed.Cir.1994). Invoking the law of the case doctrine, plaintiff directs the court to its May 20, 1999 order: " 'Because the record raises questions of material fact as to whether the contract required plaintiff to perform work orders under $2,000, summary judgment on Count II is not appropriate.' " Pl.'s Br. filed Sept. 1, 2000, at 8 (quoting *C.W. Over & Sons*, 44 Fed.Cl. at 31).

■ The notion of the "[l]aw of the case is a judicially created doctrine, the purpose of which is to prevent relitigation of issues that have been decided." *Suel v. Secretary of Health & Human Services*, 192 F.3d 981, 984 (Fed.Cir.1999). However, this doctrine does not restrict a court's ability to review its own decisions. RCFC 54(b); *see also Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); *McGowan v. Secretary of Dept. of Health & Human Services*, 31 Fed.Cl. 734, 737 (1994). Nor does the law of the case "constrain the trial court with respect to issues not actually considered by an appellate court." *Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed.Cir. 1991).

Plaintiff gleans support from *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556 (Fed. Cir.1994), a patent infringement case involving a dispute as to whether the claims at issue were entitled to the earlier filing date, or the date of the continuation-in-part application. The trial court declined to grant summary judgment, finding genuine issues of material fact, but held that the claims at issue were not entitled to the earlier filing date. On interlocutory appeal, the Federal Circuit reversed and remanded the trial court's decision, briefly discussing the law of the case doctrine. However, plaintiff misconstrues the Federal Circuit's comment on the lower court's holding regarding the filing dates. The appellate court observed that "[t]he district court made this holding the law of the case for the remainder of the trial," *Waldemar Link*, 32 F.3d at 558, not that the holding " '[became] the law of the case,' " as plaintiff contends. *See* Pl.'s Br. filed Sept. 1, 2000, at 12 (quoting *Waldemar Link*, 32 F.3d at 558). Furthermore, whether the finding that genuine issues of material fact precluded summary judgment became the law of case was not discussed in *Waldemar Link* and therefore is not on point with respect to the case at bar.

■ Denial of a previous summary judgment motion does not prevent a subsequent grant of summary judgment by the same court. "The law of the case doctrine does not affect the power of a court to reconsider its interlocutory decisions. The court may change any interlocutory decision up until the entry of final judgment." *McGowan*, 31 Fed.Cl. at 737 (citing *Jamesbury Corp. v. Litton Indus. Products, Inc.*, 839 F.2d 1544, 1550 (Fed.Cir.1988)). Assuming, *arguendo*, that the law of the case could apply to the court's previous denial of summary judgment on Count II, defendant's current motion presents new arguments based upon discovery subsequent to the court's May 20, 1999 order. Accordingly, the doctrine of the law of the case does not prevent the court from considering defendant's successive motion for summary judgment on Count II.

## 3. *Contract interpretation*

The thrust of Count II of plaintiff's complaint is that, although the "JOC contract specifically requires the Contracting Officer to bundle requests for supplies and services into $2,000.00 increments," plaintiff was com-

pelled to "process and perform" requests for less than $2,000.00. Pl.'s Br. filed Sept. 1, 2000, at 2. Because the coefficients proposed by plaintiff were not based on the estimated costs of performing work orders for less than $2,000, plaintiff claims that it suffered financial harm by completing the small work under the existing coefficients.

Plaintiff relies on contract sections I.4 and I.5 for its contention that the contract prohibited work orders under $2,000.00. Section I.4 states, in pertinent part:

> When the Government requires supplies or services covered by this contract in an amount of less than $2,000.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

As defendant points out, while the contract does relieve plaintiff of any obligation to provide supplies and services for under $2,000.00, it does not mandate specifically that the contracting officer bundle orders. Rather, the contract gives both parties the option not to contract with each other for work requests under $2,000.00.

Plaintiff also asserts that section I.5(b) reinforces its interpretation of section I.4 because I.5(b) states that the Government must "order at least the quantity of supplies or services designated in the Schedule as the 'minimum.'" Pl.'s Br. filed Sept. 1, 2000, at 15. Plaintiff posits that a $2,000.00 order minimum should be inferred from the sequential proximity of the two sections. Defendant counters plaintiff's interpretation by pointing out that "[t]he 'Schedule' referred to in clause I.5(b) is Part I under the uniform contract format established by the Federal Acquisition Regulations." Def.'s Br. filed Sept. 28, 2000 at 4; *see* FAR § 15.204–1, Table 15–1 (1999).[7] The "minimum" from the "Schedule" for the JOC is located in section H.27, entitled "Minimum Guarantee."[8] Finally, section 1.5(c) differentiates between section I.4 and the "Schedule" containing the "minimum," by stating in part that "[e]xcept for any limitations on quantities in the Delivery–Order Limitations clause [I.4] or in the Schedule, there is no limit on the number of orders that may be issued."

■ Contract interpretation "begin[s] with the plain language" of the contract. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996); *see also Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir.1993). If a contract's provisions contain clear and unambiguous language, then the court must give those words their ordinary meaning. *See Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed. Cir.1993). The language in section I.4 is straightforward and the word "bundling" is noticeably absent.

Despite plaintiff's misinterpretation of the contract language, plaintiff does raise a genuine issue of material fact as to how the parties agreed to administer the contract. Processing of small work orders became an issue early in the contract performance, with a striking pattern of the NSA's addressing plaintiff's complaints in a perfunctory manner. The parties agreed on a three-month trial procedure for small requirements, outlined in a March 7, 1994 bilaterally signed memorandum; however, this process was never followed. According to Mr. C. Over's deposition testimony, when plaintiff complained to the contracting officer about the work orders under $2,000.00, Mr. Doring replied that Mr. Cobb, the COR, should bundle the orders into $2,000.00 increments. Plaintiff continued to receive work requests for under $2,000.00, prompting plaintiff to protest by returning five small work requests on April 12, 1994.

In an April 13, 1994 memorandum, Mr. Cobb reported to Messrs. Doring and DuCharme that, after receiving the rejected work projects, he "phoned [plaintiff] to make sure that this in fact was [plaintiff]'s intent, to unilaterally refuse to accept work under the

---

**7.** FAR § 15.204–1, entitled "Uniform contract format" contains a table which provides the format that contracting offices are required to use in preparing solicitations or the resulting contracts.

**8.** Section H.27(a) states:

The minimum contract value which will be required and paid under this contract is $250,000.00 for the Base Period (FY94), and $250,000.00 for each Option Year thereafter, subject to the availability of funds.

Small Requirements Delivery Order, which does exceed the $2,000 limitations of the contract." Plaintiff, the contracting officers, and the COR met on April 13, 1994, to discuss the issue further. The contracting officers directed Mr. Cobb to bundle work requests into $2,000.00 increments, both at the meeting and in Mr. Doring's follow-up memorandum sent Mr. Cobb and plaintiff on April 15, 1994. Mr. Cobb did not comply with this directive.

Defendant posits that the bilateral execution of delivery orders 0043, 0135, and 0210, which all contained section H.28, contradicts plaintiff's contention that bundling was required.[9] On October 21, 1994, Mr. Wilson signed delivery order 0043 on behalf of plaintiff. Above Mr. Wilson's signature are the words:

ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME.

Defendant asserts that the parties mutually agreed to the terms of each order and that the execution of delivery order 0043 thereafter controlled the manner in which all future orders for work less than $2,000.00 would be prepared.

Plaintiff does not deny that it signed the delivery orders with the acceptance provisions. Plaintiff asserts that after months of Mr. Cobb's refusal to honor the contracting officer's agreement to bundle work orders up to $2,000.00, it concluded that it had no other option "but to perform the work and seek compensation through a claim for equitable adjustment." Pl.'s Br. filed Sept. 1, 2000, at 21. Furthermore, plaintiff charges that Mr. Cobb abused his position and did not deal with plaintiff fairly in a number of ways. In particular, plaintiff charges that Mr. Cobb refused to use the UPB to value the work done for delivery orders, but, rather, insisted

on negotiating the price of the items contained in the UPB. Additional allegations include Mr. Cobb's telling plaintiff that it would regret hiring a former government consultant whom Mr. Cobb opposed; requesting that Mr. C. Over give him a construction cost estimate on a house he was building (which Mr. C. Over declined to do); inquiring what his salary would be if Mr. Cobb became an employee of plaintiff; using his position to have Mr. Thomas Over's badge revoked without justification; and directing plaintiff to stop writing memoranda complaining about him. [[id. 65–66]] *See* Affidavit of Charles W. Over, Jr., ¶¶ 6–12, Feb. 24, 1999; *see also* Affidavit of Walter K. Wilson, III, ¶¶ 5–7, Aug. 30, 2000.

■ Defendant responds that plaintiff's allegations, even if proved, would not establish duress. To prove duress, plaintiff has to show that (1) it involuntarily accepted the terms of delivery order 0043, (2) the circumstances permitted no other alternative, and (3) such circumstances were the result of NSA's coercive acts. *Dureiko v. United States,* 209 F.3d 1345, 1358 (Fed.Cir.2000); *see also Employers Ins. of Wausau v. United States,* 764 F.2d 1572, 1576 (Fed.Cir.1985). An allegation of economic duress or business compulsion requires showing more than reluctance to accept a proposal or "financial embarrassment." *Green Management Corp. v. United States,* 42 Fed.Cl. 411, 438 (1998) (holding that contractor's acceptance after Government's threat of termination was not due to duress). As defendant points out in its sur-reply, plaintiff fails to demonstrate the way in which any of the conduct it ascribes to Mr. Cobb "relates to the issues raised by Count II." Def.'s Br. filed Dec. 11, 2000, at 2.

■ Defendant ably has shown the absence of both the legal and factual underpinnings to a claim of duress, and plaintiff is therefore precluded from adducing evidence on the averments of duress in its summary judgment submission. Nonetheless, the court is constrained to give plaintiff the bene-

---

**9.** Section H.28 is entitled "Small Requirements Work Order Process" and is discussed *supra* at page 345.

**350**

fit of the presumptions and inferences which it is due, *see H.F. Allen Orchards*, 749 F.2d at 1573, 1575–76, regarding the key allegation that Mr. Cobb failed to implement the contracting officers' directive allowing small orders to be bundled. Mr. Cobb's conduct in response thereto is a material fact. Trial will be confined to the issues concerning that directive, its failure to be implemented, and Mr. Cobb's conduct insofar as it demonstrates a pattern of recalcitrance.

Certain of plaintiff's allegations concerning Mr. Cobb have raised a genuine issue of material fact. A trial is necessary to fully examine the circumstances surrounding the various negotiations between plaintiff and the NSA ultimately leading to the agreements that plaintiff signed. Defendant posits that plaintiff's subsequent signing of delivery orders 0043, 0135, and 0210 and the adoption of H.28 eliminate the need to consider previous agreements reached between the parties. The court does not reach this issue, because the facts leading up to the adoption of H.28 must be developed before the court can determine whether plaintiff is barred by its acquiescence. *See Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1165 (Fed.Cir.1985) (summary judgment improper where Government had not adequately shown absence of dispute on all issues of material fact).

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion for partial summary judgment is denied without prejudice.

2. The parties shall file a joint status report by January 18, 2001, proposing a schedule for all pretrial proceedings and trial.